[Crim. No. 6208. Second Dist., Div. One. Oct. 1, 1959.]

THE PEOPLE, Respondent, v. JOHN MORRIS, JR.,
Appellant.

194

Harold J. Ackerman, under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

LILLIE, J.—Defendant was accused by information of the charge of murder of one Burke, to which he pleaded not guilty and waived a jury trial. The court adjudged him guilty, fixed the crime as first degree murder and sentenced the defendant to the state prison for life. He has appealed from the judgment of conviction and the order denying his motion for a new trial.

On October 18, 1956, shortly after 2 a. m., two men entered a bar on East Fifth Street and asked for a certain brand of cigarettes, which they then purchased. The two departed and almost immediately reentered the premises; one was the defendant. His companion demanded a drink of Burke the bartender. According to Mary Birchfield, a waitress present at the time, Burke said to the men: "I am sorry, boys, it is after hours. We are closing up and going home." She further testified that there was no "loud talking or anything." Defendant then produced a long-bladed knife with a pearl handle from his right pants pocket. As Burke shoved the waitress aside, defendant stabbed him on his left side up close under the ribs. The two men then pulled Burke outside the bar where another companion, previously observed, was standing.

Jimmie Boyd, who had left the bar earlier, was waiting across the street for a cab and saw the men drag Burke from the premises. He stated that the defendant stabbed Burke twice with a white-handled knife just below the heart on the left side. Burke was struggling, trying to get away and was heard to scream; and one of his assailants directed an obscene epithet to him. The three men (defendant, his companion and the man waiting outside the bar) fled as Boyd approached. Boyd chased one of them for some distance down the street but did not catch him. When he returned, Burke had staggered back into the bar and was suffering from several stab wounds. Burke looked up at Boyd and said: "Damn it; what happened?" A second or so later he died.

The autopsy report described six major incised wounds, most of them on the left side. Death was ascribed to stab wounds of the chest and heart with cardiac tamponade. Other conditions noted were stab wounds of the lungs and liver with internal hemorrhage.

At a police show up the defendant was positively identified by both Mrs. Birchfield and Boyd. His sole defense at the trial was an alibi. He claimed he spent the entire evening at his hotel residence some blocks away on East Fifth. Three witnesses were called to support his defense. The first, Charles Myles, testified that he and others had hired defendant "to watch our crap game for us," and that defendant became involved in a fight about 2 a. m. The other two witnesses, both female, likewise placed defendant on the same premises at or about the time of the homicide and defendant, according to his admission, had been their lookout while they

engaged in what might be inferred from the evidence as their illicit activities.

In the course of the police investigation, defendant stated in substance to an officer (the statement being prefaced by the word ''supposin' '') : If a bartender refused you a drink because of race, had a club and hit you, what would you do? When questioned later as to this statement, defendant told the police: ''Well, I said, 'just supposin', and I didn't say it was me that did it.'' There is otherwise a complete absence of any showing that the defendant and the deceased had ever seen each other before.

Appellant properly concedes that all intendments are in favor of upholding the judgment of the lower court (*People* v. *Newland*, 15 Cal.2d 678 [104 P.2d 778]), his sole contention being that the evidence is insufficient as a matter of law to sustain the finding of first degree murder. In this connection he argues that ''in the common parlance of the area there was a cutting intended, nothing more'' and, quoting from *People* v. *Craig*, 49 Cal.2d 313, 319 [316 P.2d 947], ''the evidence shows no more than the infliction of multiple acts of violence on the victim and that even though the killing was an extremely brutal one the People have proved only that the defendant was guilty of second degree murder.''

Although there is an implied suggestion by the attorney general that the killing was perpetrated by means of torture, we are here only concerned with first degree murder defined in Penal Code, section 189, as ''any other kind of wilful, deliberate, and premeditated killing. . . .'' ■ It is, of course, implicit in the above-quoted definition that the evidence be sufficient to show deliberation and premeditation in order that a conviction of first degree murder may be upheld (*People* v. *Bender*, 27 Cal.2d 164 [163 P.2d 8]). ■ The word '' 'deliberate' means formed, arrived at, or determined upon as a result of careful thought and weighing of considerations . . . 'premeditate' means to think on and revolve in the mind beforehand'' (*People* v. *Honeycutt*, 29 Cal.2d 52, 61 [172 P.2d 698]). ■ The law, however, does not require that the thought of killing be pondered for any specified length of time in order for the killing to be considered deliberate and premeditated (*People* v. *Byrd*, 42 Cal.2d 200, 212 [266 P.2d 505]), and hence ''(t)he time will vary with different individuals and under varying circumstances'' (*People* v. *Carmen*, 36 Cal.2d 768, 778 [228 P.2d 281]). ■ Further-

more, the required deliberation and premeditation need not be directly shown by the evidence but may be inferred from facts and circumstances which furnish a reasonable foundation for such a conclusion (*People* v. *Eggers*, 30 Cal.2d 676, 685 [185 P.2d 1]; *People* v. *Gulbrandsen*, 35 Cal.2d 514, 519 [218 P.2d 977]; *People* v. *Cole*, 47 Cal.2d 99, 106 [301 P.2d 854, 56 A.L.R.2d 1435]).

Since "regard should be given to what occurred at the time of the killing, if indicated by the evidence, as well as to what was done before and after that time." (*People* v. *Eggers, supra*, 686), the inference is reasonable that the defendant was carrying out a preconceived plan to kill. Such an inference is deducible "from a consideration of the type of weapon employed and the manner of its use; the nature of the wounds suffered by the deceased; the fact that the attack was unprovoked and that the deceased was unarmed at the time of the assault . . . and (appellant's) immediate flight thereafter from the scene of the assault." (*People* v. *Cook*, 15 Cal.2d 507, 516 [102 P.2d 752].) Here the weapon employed was a knife, six to seven inches long, and therefore likely to produce death when used in the manner and upon the portion of the victim's body which the witnesses described. As in *People* v. *Keeling*, 152 Cal.App.2d 4, 9 [312 P.2d 407], defendant "did not slash wildly or without aim." Two of the wounds penetrated vital structures; all measured more than one inch in depth from the skin surface; five were in the area immediately surrounding the heart, death being ascribed to "stab wounds of chest and heart." Other circumstances demonstrate a choice and plan of conduct inconsistent with a conclusion that appellant did not premeditate the killing. Thus, there was an entry upon the premises during closing hours, what could be called a pretext of buying cigarettes which afforded an opportunity to appraise the situation, the lack of surprise on the part of his companion when defendant attacked the bartender, the presence of a third person outside in the role of lookout, the lack of any spoken word among the three involved, the complete absence of any immediate provocation, the readiness of the weapon, and the dragging of the victim onto the street where the murderous assault, joined in by the lookout, was continued until the approach of the witness Boyd. Instead of a "rash impulse hastily executed" (*People* v. *Thomas*, 25 Cal.2d 880, 900-901 [156 P.2d 7]), the circumstances nar-

rated indicate that defendant, prior to entering the bar, thought over and considered his actions. "The function of the jury was to appraise the weight of the evidence; ours is to appraise its legal adequacy; . . ." (*People* v. *Holt,* 25 Cal.2d 59, 70 [153 P.2d 21]), and we are satisfied that the evidence is legally sufficient to support the implied finding of premeditation and deliberation.

This conclusion also disposes of appellant's contention that the judgment should be modified by reducing the offense to second degree murder. ■ An appellate court may not "reduce the degree of the crime unless the evidence is legally insufficient to support the higher degree of which defendant was convicted, and in determining that question, the evidence . . . is not weighed" (*People* v. *Daugherty,* 40 Cal.2d 876, 884 [256 P.2d 911]). This holding is not inconsistent with *People* v. *Dewberry,* 51 Cal.2d 548 [334 P.2d 852], cited by appellant, to the effect that whether reasonable doubt exists as between degrees of the same offense, the jury can only convict of the crime whose elements have been proved beyond a reasonable doubt (p. 556). Such proof, as already pointed out herein, was so established.

As indicated earlier, reliance is placed on *People* v. *Craig,* 49 Cal.2d 313 [316 P.2d 947], where, despite the infliction of multiple acts of violence, the crime was reduced to second degree murder. We do not believe the case to be in point for, unlike the situation at bar, there was no showing of any kind as to how the killing was accomplished; here, however, each detail of the crime was observed and described by prosecution witnesses.

■ Finally, we are asked to correlate the facts of the assault with appellant's background and education, as well as the locale of the crime. This, it seems to us, is out of harmony with the proper concession made in appellant's brief that the murder is one of first degree only if it were the result of deliberation and premeditation. True, appellant is an uneducated Negro who can neither read nor write, although he can print his name, and we take judicial notice and knowledge of the fact that the events in question occurred on the city's "skid row." Throughout the proceedings, however, appellant was adequately represented by counsel; and no authority is cited for the suggestion that special consideration should be accorded appellant because he was a resident, by choice or necessity, of the area in question. A careful

examination of the entire record convinces us that there was no miscarriage of justice.

For the reasons stated the judgment and order appealed from are affirmed.

Fourt, Acting P. J., and Shea, J. pro tem.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 25, 1959.

*Assigned by Chairman of Judicial Council.