[Crim. No. 7496.   Second Dist., Div. Two.   Aug. 17, 1961.]

THE PEOPLE, Respondent, v. JOE LEWIS POLLARD et al., Defendants; WILLIE WADE, JR., Appellant.

*Assigned by Chairman of Judicial Council.

Burton Marks, under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

HERNDON, J.—After a jury trial, appellant Willie Wade, Jr., and one Pollard were found guilty of first degree murder.[1] As to appellant the jury fixed the penalty at death, and as to Pollard at life imprisonment. Upon appellant's motion for a new trial, the court reduced his penalty to life imprisonment. (Pen. Code, § 1181, subd. 7.)

On this appeal from the judgment and from the order denying his motion for a new trial, appellant advances only one contention, namely: that the trial court erred in failing to instruct the jury as to the degrees of murder.

In appellant's opening brief it is stated: "Although the error pointed out by this counsel may be a substantial one, it is not the type of error that would require a reversal since the evidence is substantial in supporting a conviction of murder in some degree." Appellant further submits that this court "has authority under sections 1181 and 1260 of the Penal Code to modify a judgment of murder in the first degree by reducing the degree of the crime to murder in the second degree" and, in conclusion, suggests that this court should modify the present judgment accordingly.

Viewed in the light most favorable to the respondent, the record discloses the following facts:

On October 16, 1959, the victim, Kenneth Albert Swift, attended a union meeting in downtown Los Angeles. After the meeting, in the company of several friends, he had some drinks at downtown bars. He and three or four of his companions, including one Joe Tipton, then drove to a place known as the B & E Café on Central Avenue.

Swift met appellant at the Central Avenue establishment sometime prior to midnight. Swift left the B & E Café in the company of appellant sometime between midnight and 1 a. m. on the 17th. In Swift's car they drove to a liquor store in the Compton area. Swift's friend, Mr. Tipton, followed in his own car. After Tipton and Swift had conversed for a

---

[1] Pollard also took an appeal, but his appeal has been dismissed; hence, Wade is referred to herein as the appellant.

short time, Tipton stated that he was going home, it being then about 1:30 a. m. Tipton left appellant and Swift standing beside the latter's Cadillac car. This was the last time Tipton saw Swift alive.

Sometime during the early morning hours of October 17, 1959, appellant and Pollard appeared at a house located at 2702 Lantana Street in Compton. Appellant told a group of people seated in the living room that he had killed a man. Doris Hodge, one of the persons present, expressed skepticism concerning the truth of his statement. Appellant then said: "You will probably see it in tomorrow's paper."

Charles Jackson testified that early on the morning of October 17, 1959, he admitted Pollard and appellant to the house on Lantana Street. There was blood on appellant's pants legs from the knees on down and there were blood spots on his shoes. Appellant and Pollard went into the bathroom and took off their clothing. Appellant put his pants and shirt in a washtub and washed them. He also washed his shoes. The two men told Jackson that they had beaten up a man and had taken his car. They said that they had parked the car only a short distance away. One of the men took from his trouser pockets a light brown leather wallet with some papers and identification cards in it. One of them had entered the house carrying a pair of black square-toed shoes, which he offered to Jackson. Appellant had a wrist watch in his possession. On the following day Pollard showed Jackson the car which he said belonged to the man he and appellant had beaten up. It was a 1955 or 1956 Cadillac and was parked only three or four blocks from the Lantana Street house.

Doris Hodge testified that on the morning of October 18, 1959, appellant came into a bedroom of the Lantana Street house, carrying a newspaper. About that time Pollard also entered the room. Appellant laid the newspaper on the bed and began reading aloud from an article which related to the finding of a dead man's body on a vacant lot. After reading the article, appellant said: "You see. I told you." Miss Hodge said: "That could be just anybody." Then appellant "started telling us how he killed the man." He said: "I stomped him." Pollard said: "Yes, I got a little kick in myself."

On the morning of October 17, 1959, Mr. Swift's body was found lying in a vacant field at the dead end of 148th Street in the Compton area.

Sergeant Harold White, attached to the homicide depart-

ment of the Los Angeles County Sheriff's office, arrived at the scene on that morning at about 11 a.m. The victim was lying on his back. His shirt and coat were spattered with blood. The clothing was rumpled and there were foxtails over it. There were no shoes on the body or at the scene, and the victim's trouser pockets were pulled inside out. There appeared to be extensive bleeding from the nose, mouth and from parts of the head. There was considerable swelling about the nose, eyes, cheeks and jaw of the victim. Several human teeth were found on the ground near the body. The field was covered with grass and weeds. In the area around the body the weeds were well trampled, making a thin mat. A search of the victim's clothing was made; no wallet, no money nor any keys were found. None of these items was found in the vicinity.

The testimony of the autopsy surgeon indicates that the victim suffered a beating of terrific violence. The cause of death was ascribed to multiple severe injuries to the head, neck and abdomen. There were numerous lacerations of the scalp and severe fractures of the skull with depression and contusions of the brain; multiple fractures of the mandible, or jaw bone, and missing teeth; abrasions and bruises of the face. The left ear was almost completely torn off. There was a laceration of the upper lip and the nose was fractured.

An examination of the neck revealed fractures of the thyroid cartilage, anterior and posterior, with multiple superficial and deep hemorrhages. Examination of the abdomen revealed evidence of severe injury, including laceration of the mesentery, which is a sheet of tissue which joins the bowel to the abdominal wall. There were contusions of the abdominal wall and blood within the abdominal cavity resulting from the lacerations. The doctor's "educated guess" as to the time of death was between midnight and 6 or 7 a. m. on the morning of October 17, 1959.

Appellant was interrogated by police officers on May 23, 1960, and all of his statements were made freely and voluntarily. He identified a picture of Swift and said: "Yes, I know that stud. I had a beer with him." He said he had met Swift at a café on Central Avenue near Imperial. He said Swift came into the café with three other white men and asked him where he could contact some girls. They drank some beer together and after a short time two of Swift's companions left. A little later appellant, Swift and his other friend left the café. Appellant rode with Swift in the latter's car and

Swift's friend followed in his own. Appellant directed Swift and his friend to 117th and Compton where they stopped and purchased some whiskey. After they had drunk some of the whiskey, Swift's friend departed.

Appellant and Swift then got into the latter's automobile and they talked about the kind of work appellant did. Appellant told Swift he was an auto wrecker and Swift offered "to put him up in business." They then drove to the house on Lantana Street. Appellant got out of the car, went into the house, and contacted Joe Pollard. He told Pollard that he had a man outside in a car who had some money.

Appellant told the police officers that he and Pollard then agreed upon a plan to take this man someplace to take his money. It was agreed that appellant would walk in front of "the old man" and Pollard would walk behind him, and when Pollard coughed appellant was to turn around and hit him. Appellant said that this plan was carried out; that they ended up in a field; that he hit "the old man" and Pollard took his money, his shoes and his watch. Appellant stated that "the old man" drove a 1955 or 1956 blue Cadillac sedan. Asked how they had found the field, appellant said that Pollard directed them there. He said that Pollard drove the victim's car away and that he walked home.

The police later took appellant to the area. He pointed out the locations involved, and the place where he thought they had left the victim. Subsequently, the police took appellant's statement in question and answer form. His answers were substantially a repetition of the statements he had made previously. As the interrogating officer testified: "He told us about taking the old man to the Lantana Street address and taking him to the field and about the pre-arranged cough signal, and then he knocked the old man down. And, at this time, he stated that when he knocked him down, Pollard kicked him several times in the head."

*The trial court did not err in refusing to instruct the jury on second degree murder.*

A killing, intentional or otherwise, committed in the perpetration of one of the felonies enumerated in section 189 of the Penal Code constitutes murder of the first degree. (*People* v. *Turville*, 51 Cal.2d 620, 631 [335 P.2d 678]; *People* v. *Osborn*, 37 Cal.2d 380, 383 [231 P.2d 850].)

The recent decision in *People* v. *Turville, supra,* 51 Cal.2d 620, and the numerous precedents therein cited demonstrate

that appellant's sole assignment of error in the case at bar is wholly without merit. The *Turville* decision provides a complete answer to appellant's argument that the court's refusal to instruct on the degrees of murder prevented the defendants from arguing theories under which the jury might have found them guilty of second degree murder. Appellant's brief states that "[t]he defense of both defendants was alibi." They both denied assaulting or robbing the decedent and testified that they were in places at some distance from the scene of the crime at the time when evidently it was committed. Similarly, in *Turville*, the theory of defense was that it was someone other than the accused who tortured, killed and robbed the victim.

In rejecting the same argument in the *Turville* case, the court said (p. 632): "This contention is unsound, for the reason that the evidence clearly indicates that there was no tenable theory presented to the court requiring that instructions be given on any lesser degree of homicide."

█ The evidence in the case at bar pointed overwhelmingly and indisputably to a homicide committed in the perpetration of a robbery. Under such a state of the record the trial court was not required to instruct the jury on the degrees of murder. The jury properly could have been advised that defendants either were innocent or were guilty of first degree murder. (*People* v. *Turville, supra,* 51 Cal.2d 620, 633; *People* v. *Riser,* 47 Cal.2d 566, 581 [305 P.2d 1]; *People* v. *Rupp,* 41 Cal.2d 371, 382 [260 P.2d 1]; *People* v. *Sanford,* 33 Cal.2d 590, 595 [203 P.2d 534].)

█ When the evidence is sufficient to sustain a conviction of first degree murder, a reviewing court is without authority to reduce the degree of the crime. (*People* v. *Byrd,* 42 Cal.2d 200, 213 [266 P.2d 505]; *People* v. *Morris,* 174 Cal.App.2d 193, 198 [344 P.2d 333].) The sufficiency of the evidence in the present record, as we have shown, is beyond reasonable question.

The judgment and the order denying the motion for new trial are affirmed.

Fox, P. J., and Ashburn, J., concurred.