Filed 10/10/13  P. v. Sanchez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047063 |
| v. | (Super. Ct. No. 08NF2333) |
| LUIS ALBERTO SANCHEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, W. Michael Hayes, Judge.  Affirmed in part and reversed in part.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

## INTRODUCTION

Defendant Luis Alberto Sanchez appeals after a jury found him guilty of first degree murder and street terrorism. The jury found true the special circumstance allegation that Sanchez committed the murder for a criminal street gang purpose. The jury also found true the enhancement allegations that Sanchez caused the death of Miguel Reyes by personally discharging a firearm.

Sanchez raises several arguments challenging the sufficiency of the evidence supporting his convictions as well as the special circumstance allegation. Sanchez contends the trial court erred in instructing the jury as to the special circumstance allegation and also by admitting evidence of a picture of a gun found on a cell phone discovered during a search of Sanchez's residence.

We affirm the judgment except for Sanchez's conviction for street terrorism. Under the California Supreme Court's recent decision in *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1132 (*Rodriguez*), the conviction for street terrorism must be reversed because Sanchez was acting alone when he fatally shot Reyes. Sanchez's remaining arguments of reversible error are without merit.

## FACTS

### I.

### RAW

In 2004, a tagging crew known as "RAW" or "Rock A Wall" formed. In 2006 or 2007, members of RAW became increasingly involved in "beefs" with other tagging crews. Instead of simply retagging RAW graffiti that had been crossed out by RAW's rivals, RAW members would also assault those rivals. Edgar Raygoza, a founding member of RAW, characterized RAW's activities as "tag-banging," explaining the term referred to creating graffiti and committing assaults. The acronym "RAW" later stood for "Ready At War," and potential RAW members were "jumped in[]" if they

2

wanted to join.  By 2008, RAW had morphed into a "full-fledged gang" that was more focused on committing assaults than tagging.

In June 2008, Sanchez and Miguel Reyes were both members of RAW and had a "history of bad blood" between them.  Reyes had recently told friends about his plans to get married and join the military.

II.

THE JUNE 13, 2008 SHOOTING

On June 13, 2008, 60 to 75 people gathered for a high school graduation party in the backyard of a home in Anaheim.  Sanchez attended this party with other RAW members.  Reyes and his friend, Fernando Salazar,[1] also attended the party.  While there, Sanchez approached Fernando and asked him where Reyes was.  Fernando testified that Sanchez looked serious.  Fernando did not respond to Sanchez's question, but, instead, went to find Reyes and tell him that Sanchez had asked for him.  Fernando found Reyes engaged in conversation.  Fernando told Reyes about the exchange he had with Sanchez, but Reyes put his hand to Fernando, and continued talking.  Fernando "knew there was going to be some problems" and "just wanted to get [Reyes] out of there." Fernando walked away from Reyes and called a friend in an attempt to find a ride from the party for Reyes and himself.

Sanchez found Reyes, and the two stood face to face as a crowd of partygoers surrounded them.  One witness, Christopher Harrington, testified at trial that Sanchez approached Reyes and asked, "where are you from," to which Reyes responded, "nowhere."  Antonio, who was standing next to Reyes, testified that the argument was about Reyes leaving RAW.

Antonio saw Sanchez gesture to the other RAW members who had come to the party with him.  After Sanchez made that gesture, those RAW members left the party.

---

[1]  Because Fernando Salazar and another witness, Antonio Salazar, share the same last name, we refer to them by their first names for clarity and intend no disrespect.

3

Sanchez then pulled a gun from his pocket and pointed it at Reyes's chest. Reyes said, "no" or "don't do it."

Sanchez shot Reyes twice, once in the chest and once in the back. Antonio testified that Reyes attempted to run away and Sanchez chased him. Sanchez fired another three shots "side to side" in the general direction of the crowd. Javier Cedeno was struck in the head by a bullet and suffered serious injuries. While the partygoers "scatter[ed]," jumping behind bushes or running away, Sanchez got into his truck and "peel[ed] out," driving away quickly. Reyes died from the gunshot wounds; his body was found in a side yard of the house.

III.

GANG EXPERT TESTIMONY

At trial, Officer Mike Brown of the Anaheim Police Department, the prosecution's gang expert, testified that in 2008, RAW was a criminal street gang and that its primary activities were felony vandalism and "major assaults." He testified that he had personally seen "numerous felony vandalisms with RAW written on it." Brown explained that vandalism becomes "felony-level" when the cost to clean up the graffiti exceeds $400. Brown's opinion that RAW also engaged in major assaults, as one of its primary activities, was based on conversations he had in 2006 with RAW members who said they were committing assaults.

Brown further opined that Sanchez was an active participant in RAW at the time of the shooting. That opinion was based on interviews with other RAW members and contacts that Sanchez had with allied gang members. Brown testified that on a couple of occasions, the police recovered brass knuckles from individuals connected to Sanchez, and opined that showed a "propensity that he was associating himself with gang members and carrying weapons." Brown's opinion was also based on items found at Sanchez's residence. He testified that upon the execution of a search warrant on Sanchez's residence, the police found (1) a black book containing pictures of RAW

4

graffiti and (2) images of graffiti on a laptop computer discovered in Sanchez's bedroom; the graffiti included the statements, "RAW kills" and "RAW 729." In one picture in the black book recovered by the police, the words "RAW" and "Seek" (Sanchez's moniker) were written in green and the image showed a hand holding a handgun. Brown testified that he had learned the black book "was passed around the members and they would put their art in it and pass it on to the next individual."

Brown testified the police found a piece of paper on the sidewalk near the house where the shooting occurred, which said "729." He testified that RAW was also referred to as "729" and, thus, the note constituted "some announcement of RAW on that piece of paper that was left at the party." Brown further testified that gang members commit violent acts, such as shootings, in order to instill fear in the community and earn the respect of other gang members.

PROCEDURAL BACKGROUND

Sanchez was charged in an information with first degree murder in violation of Penal Code section 187, subdivision (a) (count 1); attempted murder in violation of Penal Code sections 664, subdivision (a) and 187, subdivision (a) (count 2); and street terrorism in violation of Penal Code section 186.22, subdivision (a) (count 3). (All further statutory references are to the Penal Code unless otherwise specified.) As to count 1, the information alleged the murder was committed for a criminal street gang purpose within the meaning of section 190.2, subdivision (a)(22). As to count 2, the information alleged that, pursuant to section 12022.7, subdivision (a) and within the meaning of sections 1192.7 and 667.5, Sanchez personally inflicted great bodily injury on Cedeno. As to counts 1 and 2, the information also alleged that, pursuant to section 12022.53, subdivisions (c) and (d), Sanchez intentionally and personally discharged a firearm during the commission of the offenses, causing great bodily injury within the meaning of sections 1192.7 and 667.5.

5

The jury found Sanchez guilty of counts 1 and 3 as charged. In addition, the jury found true that Sanchez committed the murder for a criminal street gang purpose within the meaning of section 190.2, subdivision (a)(22), and caused death by personally discharging a firearm within the meaning of sections 12022.53, subdivisions (c) and (d), 1192.7, and 667.5. After the jury was unable to reach a verdict on count 2, the trial court declared a mistrial as to that count, and later granted the prosecution's motion to dismiss count 2.

The trial court sentenced Sanchez to a prison term of life without the possibility of parole on count 1, and imposed a consecutive term of 25 years to life for the firearm enhancement under section 12022.53, subdivision (d). The court imposed and stayed the 20-year prison term for the section 12022.53, subdivision (c) firearm enhancement, and also imposed a two-year prison term on count 3, execution of which the court stayed pursuant to section 654.

Sanchez appealed.

## DISCUSSION

## I.

### SANCHEZ'S CONVICTION FOR STREET TERRORISM IN VIOLATION OF SECTION 186.22, SUBDIVISION (a) MUST BE REVERSED UNDER *RODRIGUEZ*, *SUPRA*, 55 CAL.4TH 1125, BECAUSE HE ACTED ALONE.

In his opening brief, Sanchez mounted several challenges to his conviction for street terrorism in violation of section 186.22, subdivision (a). He argues that conviction was not supported by substantial evidence in a number of respects and that the trial court erred in instructing the jury as to that offense.

Section 186.22, subdivision (a) provides: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers,

6

or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years." Since Sanchez filed his opening brief, the California Supreme Court decided *Rodriguez*, *supra*, 55 Cal.4th 1125, 1139, in which the court held that "section 186.22(a) reflects the Legislature's carefully structured endeavor to punish active participants for commission of criminal acts done *collectively* with gang members." The court held that a gang member who commits an offense alone, whether gang related or not, is not in violation of section 186.22, subdivision (a). (*Rodriguez*, *supra*, at p. 1139.)

Here, there was no evidence that Sanchez's murder of Reyes was committed collectively with any other gang member. In the respondent's brief, the Attorney General states that in light of *Rodriguez*, Sanchez's street terrorism conviction "should be reversed because the evidence showed he acted alone" (capitalization and boldface omitted). We agree *Rodriguez* compels reversal of Sanchez's conviction for street terrorism in count 3. We, therefore, do not need to address Sanchez's other contentions of error that pertain to count 3.

## II.

### SANCHEZ'S SUBSTANTIAL EVIDENCE CHALLENGES ARE WITHOUT MERIT.

#### A.

*Applicable Standard of Review*

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the

7

evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.  [Citation.]"  (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)  The testimony of a single witness, unless physically impossible or inherently improbable, is sufficient to support a conviction.  (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)

## B.

### *Substantial Evidence Supports Sanchez's Conviction for First Degree Murder.*

Sanchez contends insufficient evidence supported the inference of premeditation and deliberation in his commission of the murder of Reyes.  We disagree.

"'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' [Citation.]  In this context, '"premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action."' [Citation.]  We normally consider three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but '[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.' [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 645.)  "'The process of premeditation and deliberation does not require any extended period of time.  "The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' [Citation.]"  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

8

Premeditation and deliberation may be shown by circumstantial evidence. (*People v. Anderson* (1968) 70 Cal.2d 15, 25.)

In this case, evidence of all three factors supported the jury's finding of premeditation and deliberation. Substantial evidence showed a preexisting motive—retaliation for Reyes's decision to leave RAW. Substantial evidence showed Reyes had recently told friends that he was planning to join the military, get married, and consequently leave RAW. The record shows that when Sanchez confronted Reyes, he asked him, "where are you from," thereby demanding that Reyes affirm his RAW membership. After Reyes said, "nowhere," suggesting he no longer considered himself a member of RAW, Sanchez pulled out a gun and shot him.

The evidence of the manner of the killing also supported the finding of premeditation and deliberation. After Reyes responded, "nowhere," Sanchez signaled to his friends to leave, took out the gun, and shot Reyes in the chest. As Reyes tried to flee, Sanchez shot him again in the back. Sanchez's conduct at the party was so "'"particular and exacting"'" to warrant an inference that [Sanchez] was acting according to a preconceived design. [Citations.]" (*People v. Thomas* (1992) 2 Cal.4th 489, 518.)

Finally, the evidence of Sanchez's planning further supported the jury's finding of premeditation and deliberation. After Sanchez arrived at the party with other RAW members, he began looking for Reyes. After he found Reyes and Reyes responded unsatisfactorily to Sanchez's question about where he was from, Sanchez signaled to his friends to leave the party; Sanchez's friends, at a minimum, understood something was about to happen and left. Sanchez was in possession of a gun that he then pulled out and used to shoot Reyes in the chest and back. It was reasonable for the jury to find that Sanchez brought the gun with him to the party that night. (See *People v. Romero* (2008) 44 Cal.4th 386, 401 [defendant bringing a weapon to a crime location demonstrates planning activity].) The evidence thus supported a finding that the killing of Reyes was not a rash act, and "demonstrate[d] a choice and plan of conduct inconsistent with a

9

conclusion that [Sanchez] did not premeditate the killing." (*People v. Morris* (1959) 174 Cal.App.2d 193, 197.)

In his opening brief, in support of his argument that insufficient evidence supported the jury's finding of premeditation and deliberation, Sanchez points out the trial court's "failure to instruct with CALCRIM No. 522 as to provocation and second degree murder." (Boldface & some capitalization omitted.) However, Sanchez also states in his opening brief that he "does not challenge as error the court's failure to instruct with CALCRIM 522, although it certainly was, but rather he presents the omission as a partial explanation for the jury's verdict." As we explained *ante*, sufficient evidence supported the jury's finding of premeditation and deliberation. The trial court has no sua sponte obligation to instruct with CALCRIM No. 522. Sanchez expressly disclaims raising the omission of CALCRIM No. 522 as an argument on appeal. We therefore do not address it further.

## C.

### *Sanchez's Substantial Evidence Challenges to the Special Circumstance Finding Under Section 190.2, Subdivision (a)(22) Are Without Merit.*

As to the first degree murder offense charged as count 1, the jury found true the special circumstance allegation pursuant to section 190.2, subdivision (a)(22), which provides, "[t]he penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole" if the circumstance exists that "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."[2]

---

[2] "Section 190.2, subdivision (a)(22), was enacted as part of Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998, an initiative measure adopted

10

Section 186.22, subdivision (f) defines the term "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25) [(which include, as relevant in the instant case, felony vandalism and aggravated assault)], inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."

Sanchez argues the jury's true finding as to the special circumstance must be reversed because insufficient evidence showed (1) "the 'primary activities' of the RAW tagging crew were the commission of felony vandalisms and aggravated assaults" (boldface & some capitalization omitted); (2) RAW members engaged in a pattern of criminal gang activity; (3) Sanchez "actually knew" RAW members engaged in a pattern of criminal activity (boldface & capitalization omitted); and (4) Sanchez's murder of Reyes was carried out to further the activities of a criminal street gang. We address and reject each of Sanchez's substantial evidence challenges to the special circumstance finding.

1.

*Substantial evidence showed RAW's primary activities included felony vandalisms.*

At trial, the prosecution can prove a criminal street gang's primary activities through "evidence that the group's members *consistently and repeatedly*"

---

by the electorate in March 2000. [Citation.] Statements contained in Proposition 21 reflect its intent: "'Gang-related crimes pose a unique threat to the public because of gang members' organization and solidarity. Gang-related felonies should result in severe penalties. *Life without the possibility of parole or death should be available for murderers who kill as part of any gang-related activity.*'" [Citation.]" (*People v. Carr* (2010) 190 Cal.App.4th 475, 485-486.)

11

committed one of the enumerated felonies listed in section 186.22, subdivision (e). (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324.)  A gang's primary activities can also be demonstrated by expert testimony.  (*Ibid.*)  Expert testimony is sufficient evidence to establish a gang's primary activities provided the expert's opinion is premised on "material of a type that is reasonably relied upon by experts in the particular field in forming their opinions."  (*People v. Gardeley* (1996) 14 Cal.4th 605, 618 (*Gardeley*).)

Here, Brown testified that, in his expert opinion, felony vandalism was a primary activity of RAW.  (See *Gardeley*, *supra*, 14 Cal.4th at p. 620.)  Brown based his expert opinion on personal observations of RAW graffiti, while on patrol in 2008.  He stated, "[o]n patrol [he] was aware of RAW.  [He] saw RAW graffiti at the time."  He testified that now he is "the assigned investigator for RAW at Anaheim."  He testified that felony vandalism constitutes an excess of $400 of damages.  Brown's opinion that RAW's primary activities included felony vandalism was based in part on information he obtained from RAW member, Rolando Mora.  Brown's testimony was properly based on his personal experience with gangs, his personal observation of RAW graffiti, and his interview with at least one RAW member.

Relying on *In re Alexander L.* (2007) 149 Cal.App.4th 605, Sanchez contends Brown's testimony was insufficient to prove that one of RAW's primary activities was felony vandalism because Brown's testimony was conclusory and without foundation.  In *In re Alexander L.*, the gang expert did not provide any specifics as to the circumstances of the crimes, or "where, when, or how [he] had obtained the information." (*Id.* at pp. 611-612.)  Furthermore, the expert did not directly testify that criminal activities constituted the gang's *primary* activities.  (*Id.* at p. 612.)  When asked about the gang's primary activities, the expert testified:  "'I know they've committed quite a few assaults with a deadly weapon, several assaults.  I know they've been involved in murders.  [¶] I know they've been involved with auto thefts, auto/vehicle burglaries,

12

felony graffiti, narcotic violations.'" (*Id.* at p. 611.) The appellate court in *In re Alexander L.* also noted the lack of information establishing the expert's reliability, and observed that omission made it "impossible to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources . . . or entirely unreliable hearsay." (*Id.* at p. 612.)

Here, Brown directly and unequivocally testified that felony vandalism, a qualifying felony, was one of RAW's primary activities. He then provided information establishing his reliability by explaining how he knew that RAW's primary activities included felony vandalism. Thus, the jury's finding that one of RAW's primary activities was felony vandalism was supported by substantial evidence.

The Attorney General argues that substantial evidence also supported the finding that aggravated assault was one of RAW's primary activities. We need not reach this issue because the jury did not have to agree on which crime constituted the gang's primary activity. (See *People v. Seaton* (2001) 26 Cal.4th 598, 671 [jurors do not need to reach a unanimous agreement on which legal theory underlies a conviction so long as they agree the defendant committed the charged offense]; *People v. Nakahara* (2003) 30 Cal.4th 705, 712 ["jurors need not unanimously agree on a theory of first degree murder as either felony murder or murder with premeditation and deliberation"].) Because substantial evidence showed felony vandalism constituted one of RAW's primary activities, we find no error.

2.

*Substantial evidence showed RAW members engaged in a "pattern of criminal gang activity."*

Section 186.22, subdivision (e) defines the term "'pattern of criminal gang activity'" as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective

13

date of this chapter [(September 26, 1988)] and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons:  [¶] (1) Assault with a deadly weapon or by means of force likely to produce great bodily injury . . . .  [¶] . . . [¶] (3) Unlawful homicide or manslaughter."  The two or more offenses requisite to establishing a pattern of criminal gang activity are referred to as "predicate offenses."  (*People v. Augborne* (2002) 104 Cal.App.4th 362, 366.)  A charged offense may serve as a predicate offense.  (*Gardeley*, *supra*, 14 Cal.4th at p. 625.)

When the prosecution relies on a charged offense as a predicate offense within the context of proving a pattern of criminal gang activity, the prosecution must show that the charged offense was gang related.  (*Gardeley*, *supra*, 14 Cal.4th at p. 625, fn. 12.)  Predicate offenses do not otherwise need to be gang related.  (*Id.* at p. 610.)  Furthermore, "the prosecutor has no duty to prove that the persons perpetrating the predicate offenses were gang members when the enumerated crimes were committed."  (*People v. Augborne*, *supra*, 104 Cal.App.4th at p. 366.)

By finding Sanchez guilty on count 1, the jury found Sanchez murdered Reyes; substantial evidence supported that finding.  Substantial evidence also showed Sanchez was a member of RAW at that time.  By finding true the special circumstance allegation under section 190.2, subdivision (a)(22), the jury necessarily found "the murder was carried out to further the activities of the criminal street gang" (§ 190.2, subd. (a)(22)); as discussed *post*, substantial evidence supported that finding.  Count 1 therefore qualified as one of the two requisite predicate offenses required to establish a pattern of criminal gang activity.

Substantial evidence, in the form of a certified record of conviction, showed that in 2007, Richard Lopez committed an aggravated assault.  Although the aggravated assault was in the context of a domestic violence incident and was not gang

14

related, as discussed *ante*, it is not necessary that the prosecution prove a predicate offense (other than a charged offense) be gang related.

Lopez admitted he was a RAW member at the time he committed the aggravated assault offense in 2007, but, by 2009, stated he was no longer associated with RAW. Substantial evidence supported the finding that Lopez was still a RAW member in 2008 because he corresponded with Sanchez after he had been taken into custody and Brown testified that in his experience, gang members in custody correspond with other gang members for business or personal purposes. Substantial evidence therefore supported the finding RAW members engaged in a pattern of criminal gang activity.

3.

*Substantial evidence showed Sanchez "actually knew" RAW members engaged in a pattern of criminal activity.*

In *People v. Carr*, *supra*, 190 Cal.App.4th at page 485, the defendant argued the jury's true finding of the special circumstance allegation under section 190.2, subdivision (a)(22) had to be reversed because "there was no evidence at trial [the defendant] 'knew that members of a gang engaged in or have engaged in a pattern of criminal gang activity.'" The appellate court stated that although section 190.2, subdivision (a)(22) does not expressly impose a knowledge requirement, "there is a constitutional requirement that, before a defendant can be penalized for being an active participant in a criminal organization—as section 190.2, subdivision (a)(22), undoubtedly does—the defendant must be shown to have had knowledge of the gang's criminal purposes." (*People v. Carr*, *supra*, at p. 487.) The appellate court further stated: "As the Supreme Court explained in *People v. Castenada*[ (2000)] 23 Cal.4th 743, . . . ' . . . the due process requirement that criminal liability rest on personal guilt means simply that a person convicted for active membership in a criminal organization must entertain "guilty knowledge and intent" of the organization's criminal purposes.'" (*Ibid.*) The appellate court also stated, "just as a jury may rely on evidence about a defendant's personal

conduct, as well as expert testimony about gang culture and habits, to make findings concerning a defendant's active participation in a gang or a pattern of gang activity, it may also rely on the same evidence to infer a defendant's knowledge of those activities." (*Id.* at p. 489, fn. omitted.)

Here, there was ample evidence from which the jury could have reasonably inferred Sanchez's knowledge of RAW's criminal purposes. In 2008, Sanchez was a member of RAW which was a small group of about 10 to 20 members. Sanchez participated in graffiti offenses. A black book and a laptop computer, each containing images of RAW graffiti, were seized during a search of Sanchez's residence; such images included statements, such as "RAW kills." Evidence also showed Sanchez tried to get RAW members to "pitch in" to buy a gun.

Even were we to construe section 190.2, subdivision (a)(22) to require Sanchez's specific knowledge of Lopez's aggravated assault/domestic violence offense, notwithstanding our agreement with the construction of the statute applied in *People v. Carr*, *supra*, 190 Cal.App.4th at pages 486-487, substantial evidence supported the inference Sanchez had such knowledge. The record shows Sanchez and Lopez had grown up together and were RAW members, and Lopez wrote to Sanchez while he was in custody in this case. This evidence supports the reasonable inference Sanchez knew about Lopez's conviction for the aggravated assault/domestic violence offense.

4.

*Sanchez's murder of Reyes was carried out to further the activities of a criminal street gang.*

Substantial evidence supported the finding that Sanchez's murder of Reyes was carried out to further the activities of a criminal street gang within the meaning of section 190.2, subdivision (a)(22). Substantial evidence, as discussed *ante*, showed Sanchez killed Reyes because Reyes was planning to leave RAW. Before shooting Reyes, Sanchez asked him, "where are you from," which generally requires another gang

16

member to disclose his gang affiliation. (See *People v. Martinez* (2003) 113 Cal.App.4th 400, 404, 412-413 [the phrase "'Where are you guys from?'" was characterized as a gang-related comment].) When Reyes responded, "nowhere," Sanchez took out a gun and shot Reyes. Evidence was presented that "people who leave the gang are not in well standing with the other members anymore" and that a gang member who tries to leave the gang can expect to be assaulted.

In addition, substantial evidence showed RAW had morphed from its original tagging crew into a full-fledged criminal street gang. Brown testified that when a group makes such a transformation, it wants to earn respect from other gangs and does so by committing acts of violence. By seeking out and shooting Reyes in the setting of a crowded graduation party, substantial evidence supported the finding that Sanchez's murder of Reyes also furthered RAW's activities by enhancing its reputation for violence and commensurately instilling fear into the community.

III.

SANCHEZ'S CONTENTIONS OF INSTRUCTIONAL ERROR

Sanchez contends the trial court erred in instructing the jury because the court failed to instruct the jury (1) that if it found Sanchez committed count 1, it had to find it was gang related for it to serve as a predicate offense; and (2) on the elements of felony vandalism and aggravated assault for purposes of determining RAW's primary activities. The record does not show Sanchez requested that the jury be instructed on those issues. We do not need to decide whether Sanchez's claims of instructional error are forfeited, or whether the trial court erred by failing to give those instructions, because any such error was harmless.

The jury found Sanchez's murder of Reyes to be gang related by finding true the special circumstance allegation under section 190.2, subdivision (a)(22) which, as discussed *ante*, required the jury to find Sanchez committed the murder to further

17

RAW's activities. Thus, under the circumstances, any error in failing to instruct that count 1 cannot serve as a predicate offense, unless the jury found it was gang related, was harmless.

As discussed *ante*, substantial evidence, in the form of Brown's expert gang testimony, supported the finding that one of RAW's primary activities was felony vandalism. Even if the trial court were required to give an instruction on the elements of felony vandalism, whether sua sponte or pursuant to Sanchez's request, any such error would have been harmless. Section 594, subdivision (b) provides that vandalism becomes a felony offense "[i]f the amount of defacement, damage, or destruction is four hundred dollars ($400) or more." Brown testified that through his experience, including personal observation, RAW engaged in felony vandalism, and expressly testified that "felony level tagging" causes "damage of over $400 to clean up." He further testified that the City of Anaheim "does an estimation of $7.40 a square foot to clean up." He stated the extent of damage is also determined by the type of surface on which the graffiti is written. Brown's testimony regarding the elements of felony vandalism comports with section 594, and Sanchez does not argue otherwise. Under the circumstances, a jury instruction on the elements of felony vandalism would not have affected the outcome of this case, beyond a reasonable doubt.

IV.

SANCHEZ'S CONTENTION OF EVIDENTIARY ERROR IS WITHOUT MERIT.

Evidence showed that during the search of Sanchez's residence, a cell phone, containing a picture of a handgun, was found in the kitchen. Sanchez contends, "the court impermissibly allowed the prosecution to present to the jury a picture of a gun where the picture was not authenticated, i.e., it was not shown who owned the phone in question, who took the picture in question, when the picture was taken, or what, if any, relevance the phone had." (Capitalization & boldface omitted.)

18

Evidentiary error is reviewed for prejudice under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, and does not arise to a constitutional deprivation unless the alleged error deprived the defendant of preventing a defense, in which case the standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) applies. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1089; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)

Even were we to assume the trial court erred by admitting the picture of the gun into evidence, and even assuming that the *Chapman* standard applied, it appears to us "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, *supra*, 386 U.S. at p. 24.) The evidence that Sanchez was the one who shot Reyes was very strong. Evidence that a cell phone found at Sanchez's residence contained a picture of a handgun did not affect the verdict, beyond a reasonable doubt.

## V.

### CUMULATIVE ERROR

Sanchez also argues that the cumulative nature of the errors, addressed *ante*, requires reversal. "In analyzing a claim of prejudicial error, we ask whether a series of trial errors, though independently harmless, rise by accretion to the level of reversible and prejudicial error." (*People v. Najera* (2006) 138 Cal.App.4th 212, 228.)

Even assuming the trial court erred regarding the jury instructions and the admission of the picture of the gun, as discussed *ante*, "we would not say the whole of the trial court's errors outweighed the sum of their parts (*People v. Roberts* (1992) 2 Cal.4th 271, 326 . . . ), a result more favorable to [Sanchez] would have been reached in the absence of the errors (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1237 . . . ), or [Sanchez] suffered a miscarriage of justice (*People v. Hill*[ (1998)] 17 Cal.4th [800, ]844)." (*People v. Najera*, *supra*, 138 Cal.App.4th at pp. 228-229.)

DISPOSITION

Sanchez's conviction for street terrorism is reversed.  In all other respects, the judgment is affirmed.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.