Filed 2/5/26  P. v. Spells CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>COREY DELVON SPELLS,<br><br>Defendant and Appellant. | F087653<br><br>(Super. Ct. No. BF187742A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen and John Merritt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Corey Delvon Spells was charged with first degree premeditated murder (Pen. Code,[1] §§ 187, subd. (a), 189, subd. (a) [count 1]), carrying a concealed dirk or dagger (§ 21310 [count 2]), brandishing a knife (§ 417, subd. (a)(1) [count 3]), misdemeanor battery (§ 243, subd. (a) [count 4]), resisting arrest (§ 148, subd. (a)(1) [count 5]), second degree robbery (§ 212.5, subd. (c) [count 6]), assault with a knife (§ 245, subd. (a)(1) [count 7]), felony vandalism (§ 594, subd. (b)(1) [count 8]), and grand theft (§ 487, subd. (a) [count 9]). In connection with count 1, the amended information alleged defendant personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)).

Trial commenced December 12, 2023. On December 18, 2023, the prosecution rested its case. On December 19, 2023, defense counsel informed the trial court defendant—against counsel's advice—wished to testify in a narrative fashion. The trial court warned defendant of the various risks of testifying in this manner and granted the prosecution's oral motions to preclude him from testifying about certain subjects. Subsequently, defendant changed his mind and waived his right to testify. The defense then rested its case. Proceedings were adjourned for the winter holidays until January 3, 2024. That day, defense counsel informed the court defendant once again wished to testify. The court treated the request as a motion to reopen and denied it.

The jury found defendant guilty on counts 1 through 4 and 6 through 9, deadlocked on count 5, and found true the deadly weapon use allegation. The trial court declared a mistrial as to count 5 and granted the prosecution's motion to dismiss it. Defendant received (1) 25 years to life plus one year for the deadly weapon use enhancement on count 1; (2) a consecutive three years (the middle term) on count 6; (3) a consecutive eight months (one-third the middle term) on count 2; (4) a consecutive one

---

[1] Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

2.

year (one-third the middle term) on count 7; (5) a consecutive eight months (one-third the middle term) on count 8; (6) a consecutive eight months (one-third the middle term) on count 9; (7) a concurrent 180 days on count 3; and (8) a concurrent 180 days on count 4.

On appeal, defendant contends "the trial court committed prejudicial error by refusing to reopen the case to allow [him] to testify." (Boldface & capitalization omitted.) We conclude: (1) the court's denial of defendant's motion to reopen did not constitute an abuse of discretion; and (2) in the alternative, the purported error was harmless beyond a reasonable doubt. In addition, the abstract of judgment on defendant's determinate sentence must be corrected to reflect the sentence pronounced by the trial court.

<b><u>STATEMENT OF FACTS</u></b>

## I.    Uncharged offenses

L.C., the biological aunt of defendant's child, permitted defendant to live in her garage in Bakersfield between approximately May and August 2021. On May 1, 2021, L.C. phoned 911 and reported defendant had lunged at her with a knife. Bakersfield police officers were dispatched to the residence and defendant was ordered to leave. As he was preparing to do so, he pocketed what appeared to be a knife. On June 30, 2021, L.C. again phoned 911 and reported defendant was "pulling a knife out on [her] and [her] family" at her home. Officers arrived and took defendant into custody. They observed a knife with a red and black handle at the scene.

On August 6, 2021, defendant phoned 911 and asked the operator, among other things: (1) "[I]f I murder somebody, can I call this number for you guys to come pick up the body?"; (2) "Do you know anything about the metaphysical?"; (3) "Who's the guy you would call to pick up bodies?"; (4) "[W]ho can you not enforce the law on?"; and (5) "Would you send the guy out to come talk to me?" He provided L.C.'s address as his current location. When the operator inquired as to whether "something . . . happened that caused [defendant] to make th[e] call," defendant answered: "Well, it's a lot of weird

3.

things.  It's a plan, that's why I want to ask you or someone above you who's involved . . . . [¶] . . . [¶]  . . . I just want to know how that works in real life."

## II.     Count 8 (felony vandalism)

B.R., a loss prevention specialist at a Home Depot in Bakersfield, was working on September 9, 2021, when defendant entered the store at approximately 6:00 p.m. Defendant took a hammer from one of the aisles, ignored B.R.'s instructions to drop it, and headed toward the exit.  Before leaving, defendant used the hammer to shatter the automatic sliding doors.  Surveillance cameras inside the store recorded the incident.  The cost of replacing the doors was approximately $1,000.

## III.    Count 9 (grand theft)

M.S., a fine jewelry supervisor at a JCPenney in Bakersfield, was working on the night of September 8, 2021, when defendant started "barking" and "bang[ing] his fists" on display cases in her department.  He told an employee, "You're going to give me every one of these . . . diamonds out of this case in my hand."

On September 10, 2021, at around 10:00 a.m., M.S. again spotted defendant in her department "altercating with the team."  Approaching defendant alongside another manager, M.S. murmured, "I think he's going to smash the case."  Defendant overheard her and replied, "Yes, I am."  He took what appeared to be a hammer or crowbar out of his backpack, shattered a display case, and took 15 or 16 diamond rings worth over $10,000 combined.  Before leaving, defendant told M.S., "If this is not enough, I'm coming back for more."  Surveillance cameras inside the store recorded the incident.  The cost of replacing the display case was approximately $1,500.

## IV.     Count 1 (first degree premeditated murder)

On October 3, 2021, at 2:56 a.m., a bystander phoned 911 and reported an unconscious man bleeding profusely in an alleyway near the intersection of Ming Avenue and Valhalla Drive in Bakersfield.  At around 3:00 a.m., officers dispatched to the location found the man "laying on his right side" "covered in blood."  There was "a stab

4.

wound to the left side of his neck." The officers performed CPR until the paramedics arrived. The man—later identified as J.S.—was pronounced dead at 3:19 a.m.

A trail of blood led from J.S.'s body to one of the stalls at a nearby self-serve car wash. The stall appeared to be a "[m]akeshift home for possibly a homeless person." A piece of cardboard on the floor was covered with drops of blood. Investigators found a bicycle, backpack, flashlight, screwdriver, cigarette pack, and a glass pipe for smoking methamphetamine "neatly placed there rather than thrown or [otherwise] involved in a scuffle." There was no blood on the screwdriver. According to the manager of the car wash, J.S. lived there "[o]ff and on" for approximately two years and "helped" "quite often." He "had issues" such as "talk[ing] to himself" and "yell[ing]" but never caused "real trouble."

Surveillance cameras at the car wash and a nearby restaurant captured the following footage on the morning of October 3, 2021: (1) at 2:31 a.m., J.S. entered his stall carrying "[p]ieces of cardboard"; (2) at 2:34 a.m., a second person entered the stall and a "physical altercation" seemed to ensue; and (3) at 2:35 a.m., the second person bolted eastbound while J.S.—holding his neck—headed westbound toward the alleyway. Surveillance cameras at other businesses in the vicinity captured footage of the fleeing suspect, who had "a full beard and mustache" and wore a dark hooded sweatshirt, a cap with a white bill, blue jeans, and brown hiking boots with a light-colored sole.

A forensic pathologist conducted an autopsy, which confirmed J.S. sustained a single stab wound to the throat and died within minutes. There were no defensive wounds. A blood sample was obtained for prospective DNA testing. At trial, the forensic pathologist agreed the wound was "consistent with being inflicted by a knife blade."

## V.     Counts 2 (carrying a concealed dirk or dagger), 3 (brandishing a knife), and 4 (misdemeanor battery)

On October 7, 2021, F.L. was at a bus stop in Kern County when he saw defendant "arguing with all the people." Defendant then advanced on F.L. and struck him while saying, "You too, mother-fucker." Defendant took out a knife and—before leaving— prodded F.L. "to go after him" "if [he] wanted more." F.L. followed defendant to a restaurant and phoned 911. Officers arrived on the scene and arrested defendant. He had a beard and was wearing "brown-style hiking boots" as well as four silver "engagement-style" diamond rings, which were later verified to be some of the jewelry stolen from JCPenney on September 10, 2021. Officers searched defendant's person and backpack. In his jacket, they found "a red-and-black Milwaukee knife, approximately ten inches in length, which was contained within its sheath." In his backpack, they found "a black hooded sweatshirt, a white Adidas brand baseball hat and a dark-gray baseball hat." An October 7, 2021 photograph of defendant was compared to a still image taken from the October 3, 2021 surveillance footage of J.S.'s murder suspect, which revealed defendant and the suspect shared a similar beard, complexion, and build and possessed similar attire, i.e., a black hooded sweatshirt, a baseball cap with a white bill, and hiking boots.

The knife and sheath were swabbed for DNA analysis. A swab of "the crease between the knife blade and handle" contained a single-source DNA profile from a male. A criminalist compared this profile to J.S.'s blood sample and concluded J.S. could not be excluded as a potential contributor. Statistical software demonstrated the likelihood of selecting a random individual other than J.S. who would have matched that DNA profile was one in 1.3 decillion for African-Americans, one in 920 octillion for Caucasians, and one in 62 octillion for Hispanics.[2]

---

[2] At trial, the criminalist was asked why statistics were given for three different ethnic groups. She explained:

> "Certain genetic markers are more common in one ethnic group rather than another. Because we're basing it off the frequency, we want the frequency

6.

A swab of the knife handle contained a mixed DNA profile with at least three contributors. The criminalist compared this profile to defendant's buccal sample and J.S.'s blood sample and concluded neither defendant nor J.S. could be excluded as a potential contributor. Statistical software demonstrated: (1) the likelihood of selecting a random individual other than defendant who would have matched that DNA profile was one in 580 octillion for African-Americans, one in 860 octillion for Caucasians, and one in 1.2 nonillion for Hispanics; and (2) the likelihood of selecting a random individual other than J.S. who would have matched that DNA profile was one in 230 quadrillion for African-Americans, one in 26 quadrillion for Caucasians, and one in 2 quadrillion for Hispanics.

A swab of the knife blade contained a mixed DNA profile with at least two contributors. The criminalist compared this profile to J.S.'s blood sample and concluded J.S. could not be excluded as a potential contributor. Statistical software demonstrated the likelihood of selecting a random individual other than J.S. who would have matched that DNA profile was one in 9.2 nonillion for African-Americans, one in 50 octillion for Caucasians, and one in 4.3 octillion for Hispanics.

A swab of the interior of the knife sheath contained a mixed DNA profile with at least two contributors. The criminalist compared this profile to J.S.'s blood sample and concluded J.S. could not be excluded as a potential contributor. Statistical software demonstrated the likelihood of selecting a random individual other than J.S. who would have matched that DNA profile was one in 9.2 nonillion for African-Americans, one in 50 octillion for Caucasians, and one in 4.3 octillion for Hispanics.

---

to be for each of these different population groups. And our laboratory reports these three population groups because they are . . . representative of Kern County."

**VI.    Counts 6 (second degree robbery) and 7 (assault with a knife)**

On October 21, 2021, at approximately 1:00 p.m., M.N. was walking out of her office in Kern County for her lunch break when defendant came up behind her and attempted to grab her purse.  A struggle commenced.  At some point, defendant pleaded, "I need money.  I just need the money."  He punched M.N.'s head, causing her to "blank[] out" and let go of the purse.  Defendant took money and a cell phone out of the purse and fled.  M.N.'s coworkers, who witnessed the robbery, hurried to a nearby barbershop for help.  Around "eight to ten men" from the barbershop—including A.R. and V.H.—chased defendant.  A.R. caught up to defendant near the intersection of South H Street and White Lane.  V.H. saw defendant pull "a big ass knife out of his . . . hoodie" and shouted, " 'He has a knife[!]' "  Defendant stabbed A.R.'s back "really deep." Officers arrived at the intersection of South H Street and White Lane, where a bystander alerted them defendant "was running northbound on South H Street."  They spotted defendant, pursued him in their patrol vehicle, and apprehended him.  Money and a knife were found on his person.

## DISCUSSION

As noted, defendant contends "the trial court committed prejudicial error by refusing to reopen the case to allow [him] to testify."  (Boldface & capitalization omitted.)  For the reasons set forth below, we conclude (1) the court's denial of defendant's motion to reopen did not constitute an abuse of discretion; and (2) in the alternative, the purported error was harmless beyond a reasonable doubt.

**I.    Background**

At a December 6, 2021 hearing held pursuant to section 1368, the trial court determined defendant was "not presently competent to stand trial nor able to cooperate with counsel."  (Capitalization omitted.)  At a September 29, 2022 hearing held pursuant to section 1372, the court reinstated criminal proceedings, finding defendant was

"presently competent to stand trial and able to cooperate with counsel." (Capitalization omitted.)

At a December 20, 2022 hearing, defendant made an oral *Faretta*[3] motion. The trial court appointed Dr. Carvajal—a licensed psychologist—"to examine defendant to determine whether [he] can competently represent himself." (Capitalization omitted.) In a report dated January 2, 2023, Dr. Carvajal—who evaluated defendant in person, observed symptoms "consistent with mania including abnormally and persistently expansive mood and abnormally and persistently increased activity or energy, grandiosity, flight of ideas, and pressure to keep talking," and diagnosed "bipolar disorder, unspecified" (boldface & capitalization omitted)—opined defendant was "not competent to waive his constitutional right to assistance of counsel" (boldface omitted). At a February 28, 2023 hearing, the court denied defendant's *Faretta* motion. At a June 20, 2023 hearing, the court denied defendant's *Faretta* motion as well as his *Marsden*[4] motion.

On December 12, 2023, the first day of trial, defendant repeatedly interjected. At the end of the day, the court—at defense counsel's behest—conducted an in camera hearing to afford defendant "an opportunity to address the Court about some of the things he had been wanting to bring up earlier in the day." Defendant continued to interject during the trial. The prosecution rested its case on December 18, 2023.

On the morning of December 19, 2023, the trial court—at defense counsel's behest—conducted another in camera hearing. According to counsel, defendant expressed a desire to testify in a narrative fashion and indicated he would "comment on the state of the evidence . . . presented throughout the trial and effectively ways in which the People have failed to meet their burden of proof." Counsel—who advised defendant

---

[3] *Faretta v. California* (1975) 422 U.S. 806.

[4] *People v. Marsden* (1970) 2 Cal.3d 118.

not to testify, but to no avail—believed an in camera hearing would "allow [defendant] to review some of the things that he would like to testify about and hear from the Court whether or not that would be permitted," which "might give him further cause to reconsider his decision." The following exchange occurred:

> "THE DEFENDANT: . . . I only plan to testify to personal knowledge of the events, Your Honor. It is very limited and very straight to the point.

> "THE COURT: [Counsel], do you want to just ask [defendant] if he intends to testify about certain subjects that may become an issue with whether the Court will allow it or not?

> "[DEFENSE COUNSEL]: Yes, Your Honor. [¶] . . . [D]o you intend to testify in any way about what happened on the October 3rd homicide?

> "THE DEFENDANT: It is not my intention to mention anything in particular detail outside of explaining what I personally want to testify to, which I believe I have a right to say until testifying. And I understand that I may have to be subjected to cross-examination, and I'm prepared for that, Your Honor.

> "THE COURT: To answer [counsel]'s question, do you intend to testify about any events that you saw or heard on October 3rd of 2021? That was the date of the alleged murder.

> "THE DEFENDANT: Possibly, but possibly not, Your Honor. It would be limited in its narrative form. I'm not sure exactly what would happen as far as cross-examination in considering that testimony as well, but as far as a narrative delivery, only things from my personal experience, Your Honor.

> "THE COURT: [Counsel], any response to that?

> "[DEFENSE COUNSEL]: Your Honor, I think that in terms of what [defendant] wants to testify to, it sounded earlier like he wanted to testify as to the strength or weakness of evidence other than comparing it to something in his personal experience. I want to make sure he knew that wasn't going to be permitted.

10.

"THE DEFENDANT: Absolutely. I guess I will let the evidence hold or fall as it is and only testifying to my personal experience towards the evidence, Your Honor.

"THE COURT: So just to follow up on the subject [counsel] is kind of bringing up, you're not going to get on the witness stand and make a closing argument and tell the jury here's why the prosecutor hasn't proved his case.

"THE DEFENDANT: No.

"THE COURT: Here's why the evidence is weak or you should reject this evidence.

"THE DEFENDANT: Just my personal experience with maybe the evidence as a narrative, that may cross over, but nothing dealing with how they went about it. [¶] . . . [¶]

"[DEFENSE COUNSEL]: . . . [¶] . . . [D]o you want to say anything about the JC Penney incident?

"THE DEFENDANT: I'm not sure. I guess I will make that decision once I start the narrative, but it's not my intention to mention anything outside of my personal experience and what was presented as evidence. [¶] . . . [¶]

"[DEFENSE COUNSEL]: Do you intend to say anything about the Home Depot incident?

"THE DEFENDANT: No, I do not.

"[DEFENSE COUNSEL]: What do you mean when you say JC Penney? Just your personal experience? Are you going to say you were there or it happened differently or say you were not there?

"THE DEFENDANT: I know I have a right to not self-incriminate, and me speaking with my personal experience as the accused and as what was presented will be within the fine line of speaking from my experience.

"[DEFENSE COUNSEL]: Do you mean that you want to talk about your experience throughout the trial and court process? What experience are you talking about?

"THE DEFENDANT: Just the experience dealing with the events that played out and the evidence that was presented.

11.

"[DEFENSE COUNSEL]: You're making it sound like you want to comment on the evidence. [¶] Is that what you wanted to do? Or do you want to testify about things that happened to you directly?

"THE DEFENDANT: Well, the evidence that was presented here – although I wasn't disclosed of the evidence leading up to the point, nevertheless, just my personal involvement and the evidence that was presented.

"[DEFENSE COUNSEL]: So . . . do you think that you're going to be allowed to testify about how the trial process went for you or when you had access to documents?

"THE DEFENDANT: I'm not sure what would be allowed as testimonial evidence at this point, but me explaining the narrative, it's not my intentions, I guess, to take the jury on a journey of technicalities or violations or procedure process. It is just to explain my personal experience for the events of the days accused and, you know, the information that was presented on the events and the days of those accusations.

"THE COURT: If you want the Court's input on that, . . . if you testify about the day that there was an incident at JC Penney, all the Court's going to allow you to say is what you did that day. And if you did something, here's what I did, here's where I went, here's what I did, here's what I did not do. That's all you'd be allowed to say. [¶] Understood?

"THE DEFENDANT: Understood. [¶] . . . [¶]

"[DEFENSE COUNSEL]: Do you want to tell the jury anything at all about the homicide incident one way or another?

"THE DEFENDANT: No, not personally. It's not my objective to speak on that issue at all. [¶] . . . [¶]

"[DEFENSE COUNSEL]: . . . [¶] . . . [D]o you want to talk to the jury in any way about DNA evidence?

"THE DEFENDANT: I mean – meaning in what scope?

"[DEFENSE COUNSEL]: Do you think that by testifying, you're going to be able to tell the jury that the DNA evidence was falsified in some way?

"THE DEFENDANT:  I believe we just state the facts presented, the evidence, and I think the purpose is to allow the jury to come up with that conclusion on their own.  It's not for me to come up with any outside opinion besides what was presented or wasn't presented as we know the facts.

"[DEFENSE COUNSEL]:  What do you think you're going to accomplish by testifying?

"THE DEFENDANT:  By being able to explain the events that happened.

"[DEFENSE COUNSEL]:  Which events?

"THE DEFENDANT:  Whichever ones I decide to speak on and the way that it happened to me in first person.

"THE COURT:  I'll just go ahead and give [defendant] my tentative. [¶] . . . [Y]ou have no personal knowledge of the collection or analysis of blood or other objects for the presence of DNA, and I would prevent you from testifying about DNA completely.  [¶]  Do you understand that?

"THE DEFENDANT:  No, Your Honor.  I have personal experience. I was involved in the testing and I have personal experience of being here and it being presented to me.  I have that personal experience of what happened.

"THE COURT:  You don't.  The things that you saw in the courtroom are not the subject of testimony.  You can only testify about things that you saw or heard or did on the dates in question.  If you start talking about DNA in any way, I will cut you off.  [¶]  Do you understand?

"THE DEFENDANT:  Your Honor, can I testify to the things that happened to me on the day of the DNA presentations?

"THE COURT:  . . . .  [¶]  In the courtroom?

"THE DEFENDANT:  Yes, Your Honor.  That's personal experience.

"THE COURT:  That's not relevant evidence.  It's not relevant.

"THE DEFENDANT:  I'm not sure how it's not relevant if I'm addressing issues that I was personally involved in.

13.

"THE COURT: Because that's argument. It's called argument. You're arguing to the jury how they should view the evidence presented during the trial. I will not allow you to do that.

"THE DEFENDANT: I don't plan on making an argument at all or trying to have any persuasive tone. It would just be definitely stating the facts.

"THE COURT: If you take the witness stand and testify on your own behalf, you will not be talking about DNA. I'm just giving you that warning. [¶] Do you understand?

"THE DEFENDANT: I'm not sure the reason why, Your Honor. I was a part of that, and I think I have a right to testify to that if I'm not creating anything outside of exactly what was presented and, you know, my participation within that presentation.

"THE COURT: I'm telling you, based on my knowledge of the law and my knowledge of the Evidence Code, that that would not be proper testimony, and you're not going to do it. That's my decision.

"[DEFENSE COUNSEL]: . . . I think that the Court's ruling is going to apply to any testimony from you about anything that happened either during the trial or during the period of time you were in jail. I think the Court will limit your testimony to your personal experiences before your final arrest. If your goal is to testify, to talk about anything that happened while the jury was here or anything that happened while you were in the state hospital or at Lerdo or at prior court hearings, none of that is going to be allowed to be presented to the jury. I think the Court would back me up on that.

"THE COURT: I'll confirm [counsel] is correct.

"[DEFENSE COUNSEL]: If that's what you wanted to tell them about, that's not going to be allowed. If that's what you wanted to tell them, I think we can make a record that you feel you should be allowed to tell them that and you're not going to be allowed to tell them that. [¶] Then the question would be, is there something from before you were arrested you still want to testify about?

"THE DEFENDANT: Yes. Yes, I would continue to testify for the events that happened to me, I guess, pre-arrest. But also, that's a difficult situation to speak on legally from properly being documented as arrest dates, I guess, all the way up until the last time – I guess I was officially,

14.

unofficially, and I don't see how I won't be able to testify to events that played out that may have contradicted with the personal experience which I've seen that's presented as factual evidence if the [p]rosecution is allow[ed] to speak on those subjects. I don't see why I can't personally speak on the subjects that –

"THE COURT: I'm just telling you you're not going to be allowed to testify about anything that happened in this courtroom. [¶] Do you understand?

"THE DEFENDANT: Yes, Your Honor. Anything that happened in this trial court?

"THE COURT: Or after you were arrested while you were awaiting trial.

"THE DEFENDANT: Your Honor, that's where, I guess, a part of the storyline in which it would be necessary to narrate. Because I wasn't – for particular instances, I wasn't even made aware of those incidents until in custody.

"THE COURT: I'm just telling you you're not going to do it. You can disagree with me, and we're making a record. And if you're convicted and it goes on appeal, obviously the Court of Appeal and your appellate attorney can look at what we're doing and decide if I was correct or not. But that's my decision, sir, so think about that when you decide if you really want to take the stand to testify.

"THE DEFENDANT: Yes, I want to testify, Your Honor."

Following the in camera hearing and outside the jury's presence, defense counsel reiterated for the record defendant—against counsel's advice—wished to testify in a narrative fashion. The following exchange occurred:

"THE COURT: . . . . [¶] . . . [W]ith regard to your testimony, while your attorney . . . will be here, do you understand he will not be conducting the examination of you?

"THE DEFENDANT: Yes.

"THE COURT: It's not going to be a question-and-answer situation as we have seen with the other witnesses. [¶] Understood?

"THE DEFENDANT: Understood.

15.

"THE COURT:  Rather, you'll be allowed to testify in a free-flow, narrative way.  And if you wish to elicit additional information, you will have to cover that yourself.  Your attorney isn't going to be suggesting why don't you also talk about this or that.  [¶]  Understood?

"THE DEFENDANT:  Yes.

"THE COURT:  Is that what you want to do?

"THE DEFENDANT:  Yes, I do.

"THE COURT:  Now, I'm also going to make sure you understand that the prosecutor is going to be allowed to make objections to things that you say.  [¶]  You understand that?

"THE DEFENDANT:  Yes.

"THE COURT:  And that will be based on the Rules of Evidence, and you're going to have to follow the Rules of Evidence in terms of what's admissible and the things you want to tell the jury.  [¶]  Do you understand that?

"THE DEFENDANT:  Your Honor, is the [p]rosecution under the same Evidence Code and rules in which you're saying apply to me about inadmissible evidence as well?

"THE COURT:  All witnesses are subject to the same Rules of Evidence.

"THE DEFENDANT:  Okay.

"THE COURT:  So I'm going to assume there are many good reasons why your attorney doesn't want to call you as a witness.  First, . . . my advice to you is to follow your attorney's advice and not testify.  [¶] Do you hear me?

"THE DEFENDANT:  I hear you, Your Honor.

"THE COURT:  But that's your decision to make.  You have a Constitutional right to testify in a criminal case when you're the defendant charged.  The [prosecutor] may make objections to any parts of your testimony, again, based on the Rules of Evidence.  He may cause some things to be excluded from testimony.  [¶]  Do you understand what that means?

"THE DEFENDANT: Yes.

"THE COURT: If you start talking about something that is not admissible, the [prosecutor] can make an objection. And If I sustain it, . . . I can strike that portion of your testimony and tell the jury to not consider it. [¶] Understood?

"THE DEFENDANT: Understood.

"THE COURT: And another thing that you should think about. . . . [Y]ou will be, to a limited degree, acting without a lawyer and you will be acting as your own lawyer to some extent. [¶] Is that your desire to do that?

"THE DEFENDANT: Just for the portion of this testimony – is that correct – that I would?

"THE COURT: While you're on the witness stand testifying.

"THE DEFENDANT: Yes.

"THE COURT: Is that what you want to do?

"THE DEFENDANT: Yes.

"THE COURT: Another thing you should think about is the possibility that a jury, having seen this trial conducted in a question-and-answer situation with all the other witnesses, now having you testify in a narrative manner, the jury may jump to the conclusion that your own attorney doesn't believe what you're telling me. [¶] Do you understand there's that possibility?

"THE DEFENDANT: I don't believe that would be the perception of the jury. I understand how that could be viewed.

"THE COURT: I don't know what the jurors are going to think about it, but one real possibility is they're going to think maybe your own attorney doesn't believe what you're telling them.

"THE DEFENDANT: I can see how that can be seen that way, but based upon the information in which I would present, I don't think it could come off as something unbelievable by me from counsel.

"THE COURT: Do you understand that's the risk you're taking?

"THE DEFENDANT: Yes.

17.

"THE COURT: I'm going to tell you, . . . I think you're making a mistake by choosing to take the stand against your attorney's advice. I don't know the details other than what we discussed in camera, which we're not going to go back into. I think you're making a mistake and, given all the circumstances, it may have a very negative effect on the outcome of this case for you. [¶] Do you understand that?

"THE DEFENDANT: I understand that, Your Honor.

"THE COURT: My advice to you is not to take the stand and testify over your attorney's objections. [¶] Do you understand?

"THE DEFENDANT: I understand.

"THE COURT: But you do have the right to testify. And if you choose to testify in light of all of these warnings, then you'll be allowed to do that even though I'm advising you not to. [¶] Understood?

"THE DEFENDANT: Yes, I do.

"THE COURT: Now, you're not trained in the law like your attorney is, and it's my belief that you're not equipped to handle the evidentiary objections that [the prosecutor] is likely to make. [¶] Do you understand that?

"THE DEFENDANT: I'm not sure, actually, what he will be objecting to, but I only plan to testify from my personal experiences. It will be very limited and direct, but there may be some legal, I guess – how should I say it? This may be formally under a legal umbrella in which I don't have a full scope as to how it works and within procedures. I doubt that I won't be able to respond.

"THE COURT: When you're on the witness stand and you're testifying about a certain subject matter, if [the prosecutor] objects on grounds of relevance, on grounds of hearsay, on grounds of foundation, I'm going to decide and rule on that objection without any input from [defense counsel]. [Defense counsel] won't get involved in that. [¶] Do you understand?

"THE DEFENDANT: I understand relevancy hearsay and foundational to a competent level to, I guess, be fluent enough to participate cordially.

"THE COURT: I just want to make sure you understand if [the prosecutor] makes objections during your testimony, [defense counsel] is not coming to your assistance to respond. [¶] Understood?

"THE DEFENDANT: Yes. Absolutely.

"THE COURT: You're on your own. That's where you're representing yourself to a limited extent.

"THE DEFENDANT: Yeah.

"THE COURT: That's what you want to do?

"THE DEFENDANT: Yes.

"THE COURT: . . . [¶] Your attorney would be ethically barred from arguing in his closing argument anything about your testimony that your attorney believed to be untrue. [¶] Do you understand that?

"THE DEFENDANT: Yes. I don't – I'm not going to present any false information, Your Honor.

"THE COURT: I'm just telling you that I want you to understand the rule. Your attorney has to comply with the Rules of Professional Conduct, which is like the ethics that the attorneys have to follow. I'm telling you he would be ethically banned or barred from arguing closing argument to the jury about anything in your testimony that your attorney believed to be untrue. [¶] Do you understand?

"THE DEFENDANT: Yes, Your Honor. I read the professional codes from the lawyers in the prosecution, and I understand the code of ethics that apply very well, Your Honor. [¶] . . . [¶]

"THE COURT: And so in light of all of these warnings that I've been giving you so far, . . . are you still choosing to testify?

"THE DEFENDANT: Yes, I am.

"THE COURT: You're choosing to do so in a narrative manner?

"THE DEFENDANT: Yes, Your Honor.

"THE COURT: So what I've been trying to do is warn you about the dangers of self-representation to make sure that you are making an informed decision that, yes, during my testimony I understand [defense counsel]'s not going to be there to help me.

19.

"THE DEFENDANT:  Yes.

"THE COURT:  Also, the dangers of the free narrative approach that the jury may view in a negative way.

"THE DEFENDANT:  Yes.

"THE COURT:  Do you understand all those dangers?

"THE DEFENDANT:  Yes, I do.

"THE COURT:  I've warned you that [defense counsel]'s not going to participate in this one phase of the proceeding.  You'll be acting as your own attorney to some extent when you're on the witness stand, and you're going to be held to the same standards as an attorney.  [¶]  Do you understand that?

"THE DEFENDANT:  Yes.

"THE COURT:  This is the same thing we tell any defendant that wants to represent himself.  We don't give you special privileges that will be different from what we give to an attorney.  If you want to represent yourself, you're going to be held to the same standards as any attorney.  [¶] Understood?

"THE DEFENDANT:  Yes, Your Honor.  But, you know, the privilege that the attorneys do have is full disclosure of all information involved.  And limited to that, I can't perform to the best of my ability of performing in that nature minus having the opportunity to understand what would be the Rules of Court and the information that applies to this case and how that works simultaneously.  Beyond that, yes, Your Honor, I understand I'm held to that standard.

"THE COURT:  . . .  [I]f your attorney chooses not to present your testimony and if the [d]efense rested, that gives you the ability to argue that the People have failed to prove each and every element of the charges beyond a reasonable doubt.  [¶]  Do you understand that?

"THE DEFENDANT:  What would be different if I testify, Your Honor?

"THE COURT:  If you testify, you may actually be helping the prosecutor.  Some of the things you say may tend to incriminate you or may tend to assist the arguments the prosecutor will make, that he has proved it beyond a reasonable doubt.

20.

"THE DEFENDANT: I understand that, Your Honor.

"THE COURT: The risk you're running is, rather than helping your own defense, you could end up actually helping the [p]rosecution convict you. [¶] Do you understand that?

"THE DEFENDANT: I understand your concern for that potential, Your Honor, within that warning.

"THE COURT: You also understand you have a Constitutional right not to testify?

"THE DEFENDANT: Yes, Your Honor. I think I understand the Constitutional value within the immunities, privileges and protections afforded to me.

"THE COURT: If you chose not to testify, I would instruct the jury that they cannot consider your silence in any way. They can't discuss it or can't consider discussing it among themselves because it's not relevant, and they can't use it in any way against you. [¶] Do you understand that?

"THE DEFENDANT: Well, yes, Your Honor. But my concern is the effect of what silence may have sometimes. And I understand the potential of creating new avenues for [the p]rosecution, and I think it would be in my best interest to at least speak on my behalf.

"THE COURT: That's fine. [¶] You understand that if you chose not to testify, I would tell the jury they can't consider that for any reason?

"THE DEFENDANT: Yes, Your Honor.

"THE COURT: Now I'm going to be giving the jury instructions on the law, which include instructing how to weigh the credibility of a witness. If you take the witness stand, they're also going to be considering those instructions as they weigh your credibility. [¶] Understood?

"THE DEFENDANT: Understood.

"THE COURT: Those are all the advisals that I think are reasonable and appropriate to give. . . ."

The jury—which had been "languishing" "in the hallway about 40 minutes"—entered the courtroom and were given an extended lunch break so the court and counsel could resolve "some matters" that were "not finished." Outside the jury's presence, the

21.

prosecutor moved to preclude defendant from testifying about certain subjects. The following exchange occurred:

"[PROSECUTOR]: Your Honor, I'm requesting that the Court instruct and preclude . . . defendant from testifying about the DNA testing in this case, how it was done, the science behind it. I'd be objecting to him testifying about the specific results of the DNA testing or the credibility of the DNA laboratory witnesses. And then finally, as to the DNA, I would object to him testifying about any laboratory documents, reports he did or did not have. And my objections to that sort of testimony would be foundation, hearsay, and then as to the last part about documents he did or did not have as relevance. The reason I bring that up is during those witnesses' testimony, . . . defendant himself personally objected multiple times. [¶] . . . [¶]

"THE DEFENDANT: I object, Your Honor.

"THE COURT: State the basis for your objection.

"THE DEFENDANT: The [p]rosecution was allowed to use that as relevance, hearsay and foundational evidence, and I would like to do the same, Your Honor.

"THE COURT: . . . You're not going to do that. You're not going to get to testify about that.

"THE DEFENDANT: Why would the Court allow hearsay evidence and not the other if he's claiming that to be hearsay?

"THE COURT: I made my ruling. That's my ruling. . . . I'm granting that motion. . . . [¶] What's your next motion . . . ?

"[PROSECUTOR]: My second oral motion in limine is to preclude . . . defendant from testifying about discovery in general, any discovery or evidence he personally had or did not have as part of this case, as it would be irrelevant. [¶] . . . [¶]

"THE COURT: . . . [Y]our response.

"THE DEFENDANT: Absolutely, Your Honor. I have a right to testify to my personal experience during the day and events that played out during those actions within its totality, Your Honor.

"THE COURT: Anything else . . . ?

22.

"THE DEFENDANT: No, sir.

"THE COURT: I'm granting the motion. I'm going to find it would be irrelevant. You will not be allowed to testify on that. [¶] Understood?

"THE DEFENDANT: I'm not sure exactly what all that covers within me trying to narrate the experiences that played out, Your Honor. I'm not sure how that would work in the narrative form if everything that I say is testimonial evidence.

"THE COURT: You're not going to be allowed to talk about discovery or what evidence you've obtained or have not obtained. [¶] Do you understand that?

"THE DEFENDANT: Yes. Evidence that I obtained and not obtained, I object to that.

"THE COURT: I'm making a ruling. I'm overruling your objection. [¶] What's your next motion . . . ?

"[PROSECUTOR]: My third oral motion in limine is asking the Court to preclude . . . defendant from discussing the credibility of other witnesses that have testified in this case or discussing their specific testimony in court, as it would be hearsay and irrelevant.

"THE COURT: . . . [Y]our response.

"THE DEFENDANT: Yeah, Your Honor. How can it be hearsay if I'm testifying to events that took place personally, directly with me?

"THE COURT: That's not the motion. He's not saying you can't testify that, on October 3rd, here's what I did or did not do.

"THE DEFENDANT: Here's what happens, this is who I said hey to, this is who I didn't speak to.

"THE COURT: He's not excluding that.

"THE DEFENDANT: Okay.

"THE COURT: He's excluding you from talking about other witnesses and whether they're credible or not.

"THE DEFENDANT: Your Honor, my personal opinion of credibility wouldn't matter if I'm just speaking upon the facts that played out. I think that's credibility for the jury to decide.

23.

"THE COURT:  Right, but you're not going to offer your opinion about whether certain witnesses are credible.

"THE DEFENDANT:  No, I'm not going to offer any opinions outside of factual.

"THE COURT:  I'm granting that motion."

A recess was taken to allow the court and counsel to "do some further research" on an issue "brought up at sidebar."  After the recess, the court expressed concern that letting defendant "testify in a narrative manner without counsel's participation" not only "opens himself up to considerable prejudice" but also amounted to defendant "waiving his right to counsel in a limited fashion."  Regarding the latter point, the court noted—and counsel agreed—Dr. Carvajal opined in his January 2, 2023 report "defendant lacked the ability to make a knowing and intelligent waiver of his right to counsel" "due to mental illness."  The court pronounced:

> "I'm balancing [defendant]'s right to testify against his Constitutional right to be represented by counsel, effectively represented by counsel.  And I do find, based not only on Dr. Car[v]ajal's report, which is the basis for the Court denying his *F[a]retta* motion, but also on [defendant]'s inability, I think, to fully comprehend what's going to happen if he gets on the witness stand.  Everything that [defendant] has told me today suggests that he is not going to focus on the facts of the case and on what he did or what he saw or what he heard, but rather he's going to try to argue points.  He's going to try to talk about discovery.  He's going to talk about a lot of other things, and he may end up saying things that either incriminate him or prejudice a jury against him.

> ". . .  I think there's a great risk that allowing him to represent himself on his direct, even though it's a limited self-representation, could well result in a spectacle that would be very prejudicial to him and deny him a fair trial.  That's a fundamental part of a fair trial, is not to put people who have mental illness that affects their mental competence on a witness stand or represent themselves in a courtroom in a way that denies them the right to effective assistance of counsel.

> "It's my tentative finding that that's what would happen . . . if I allow . . . defendant to get on the stand and testify in a narrative manner without the participation of [defense counsel] on his direct.  My tentative is

24.

to find that he lacks the competence to make a knowing, intelligent, voluntary waiver of his right to counsel even for the limited purpose of his direct examination in a narrative manner. And in balancing his right to a fair trial with the effective representati[on] of counsel, balancing that against his right to testify on his own behalf, I find that the interests of justice fall inside of a fair trial and I'm going to deny his request to testify in a narrative manner. That's my tentative." (Italics added.)

Thereafter, the following exchange occurred:

"THE DEFENDANT: Maybe I can save the Court the dialogue. I elected not to testify. I wanted to notify the Court of that beforehand instead of just jumping into the dialogue. I have elected not to testify, Your Honor. And just for the record, just for personal reflection besides legal documentation, I was cleared competent to not only stand trial but to represent myself as well. And within those second evaluations from Car[v]ajal, it was actually questionable about his complete practice, Your Honor. Conflicting things that he ruled in that evaluation is absolutely disgusting and completely false by way of his own wording. I thought that was totally disrespectful. Your Honor, to me personally, after engaging with Car[v]ajal, I understand his interest with the Court's decision to not allow that to happen. Personally, between me and you, Your Honor, that was probably one of the biggest things in which I had to –

"THE COURT: I'm going to suggest that you confer – why don't you stop and confer with [defense counsel] off the record before you keep talking.

"THE DEFENDANT: Also, Your Honor, my intentions with testifying was not to speak on anything unrelated to my personal involvement. I understand your fear of prejudice against a fair trial, and I absolutely respect that not only on the grounds of competency but also on the grounds of being in harmony with the court's local practice and procedures, which I, too, am in harmony with. I was only seeking relief for myself personally. It wasn't my intention to testify against anything of scientific relevance or any processing or anything technical. I ask the Court to keep that in remembrance. I do hold that faithful, Your Honor.

"It's definitely not my interest to share any of those things with anyone outside being deemed necessary of earning that right. It definitely wasn't my intentions, and it's not my intentions in the future to speak on anything outside me gaining personal relief from it, Your Honor.

25.

"THE COURT: I'm going to ask you to stop right now and confer briefly with [defense counsel], because we have a jury waiting in the hallway, and we need to know if you are going to testify or if your decision is to not to testify.

"[DEFENSE COUNSEL]: Your Honor, after conferring off the record, [defendant] again indicated that he no longer wishes to pursue testifying. I believe he is prepared to waive his right to testify and proceed with the trial without testifying, which removes the need for me to make any further requests.

"THE COURT: All I've done is express a tentative if he was going to insist on his right to take the stand. That becomes moot if he is now changing his mind.

"[DEFENSE COUNSEL]: I'll make sure on the record. [¶] [Defendant], after all the discussions we had and your discussion with me off the record, the discussion with the judge in the morning, is it correct that you wish to waive your right to testify and not testify in your own defense and proceed with the trial?

"THE DEFENDANT: Yes.

"[DEFENSE COUNSEL]: Your Honor, I'm satisfied unless the Court has other questions.

"THE COURT: I just want to make sure . . . that this is your own voluntary decision.

"THE DEFENDANT: Yes. I choose not to testify, Your Honor.

"THE COURT: I'll find that he's made a knowing, intelligent, voluntary decision to not testify and to now exercise his Constitutional right to remain silent."

The jury was brought back into the courtroom and the defense rested its case. Proceedings were adjourned for the Christmas holidays until January 3, 2024.

On January 3, 2024, outside the jury's presence, defense counsel informed the trial court defendant once again wished to testify even though he "chose not to" "before the Christmas break." The following exchange occurred:

"THE DEFENDANT: That's correct, Your Honor. Besides not having clarity on the options of testifying, whether in a narrative form or, I

26.

guess, the standard traditional form, I chose to testify in a narrative form. And for the reasons that the Court mentioned previously that I was going to be denied that right, and I elected not to testify. I would like to preserve that right to testify and I do not wish to waive it.

"THE COURT: I'll correct something that you said. I never denied your right to testify in a narrative form. I informed you of the risks that you were facing and advised you it was not probably in your best interest to do so, but I did not deny that. You have the right to do that if you chose. You chose not to.

"THE DEFENDANT: I believe the Court, along with the prosecutor, cited references of case law which said that I would be acting in a limited fashion of representing myself, which I haven't got clarity on that. For that reason I was denied because of evaluation previously.

"THE COURT: Your request to reopen the Defense evidence is denied. I find that it's untimely. . . ."

## II.    The trial court's denial of defendant's motion to reopen the case to allow him to testify did not constitute an abuse of discretion.

A defendant who informs the trial court of his or her desire to testify after the case has been rested essentially moves to reopen the case. (*People v. Blackburn* (1982) 139 Cal.App.3d 761, 765.) "It is well settled that the trial court has broad discretion to order a case reopened and allow the introduction of additional evidence. [Citations.] Such a decision is proper in the absence of an abuse of discretion. [Citation.]" (*People v. Goss* (1992) 7 Cal.App.4th 702, 706.) "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.) " 'Factors to be considered in reviewing the exercise of [the trial court's] discretion include the stage the proceedings had reached when the motion was made [citation], the diligence shown by the moving party in discovering the new evidence [citation], the prospect that the jury would accord it undue emphasis [citation], and the significance of the evidence.' [Citation.]" (*People v. Goss*, *supra*, at p. 706.)

27.

Furthermore, "we keep in mind that we review the trial court's ruling, 'not the court's reasoning and, if the ruling was correct on any ground, we affirm.' [Citations.]" (*People v. Camacho* (2022) 14 Cal.5th 77, 123–124.)

Here, defendant moved to reopen the case so that he could testify. This testimony, however, "was indisputably available during the trial" (*People v. Monterroso* (2004) 34 Cal.4th 743, 779, italics omitted) and did not constitute new evidence discovered late in the proceedings (*People v. Jones* (2012) 54 Cal.4th 1, 66). The motion was raised January 3, 2024, more than two weeks after close of evidence and upon termination of the holiday adjournment. (Cf. *People v. Jones* (2003) 30 Cal.4th 1084, 1110 [motion to reopen "made shortly after the closing of evidence"].) Given this timing, a court could reasonably infer that if the motion were granted, "the jury may have given the evidence more weight than it deserved, and put the prosecution at an unfair disadvantage." (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1521; see *People v. Rodriguez* (1984) 152 Cal.App.3d 289, 295 ["Presumably one of the reasons underlying the requirement of diligence is that a jury may accord undue weight to evidence which is admitted close to the time deliberations begin."].)

Most importantly, if defendant were allowed to testify,[5] the significance of his testimony would have been dubious. On December 19, 2023, prior to making the motion

---

[5] As noted, the trial court was concerned defendant's narrative testimony would entail a limited waiver of his right to counsel, a waiver—according to Dr. Carvajal— defendant could not execute because of his mental illness. (See *People v. Wycoff* (2021) 12 Cal.5th 58, 89 [forensic psychologist's report constituted substantial evidence of the defendant's incompetence to waive right to counsel].) As a result, the court issued a tentative ruling that—after balancing "[defendant]'s right to testify against his Constitutional right to be . . . effectively represented by counsel"—denied defendant's request to testify in a narrative fashion because "he lacks the competence to make a knowing, intelligent, voluntary waiver of his right to counsel even for the limited purpose of his direct examination in a narrative manner." (See *Indiana v. Edwards* (2008) 554 U.S. 164, 177–178 ["[T]he [United States] Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so."]; *People v.*

at issue, defendant communicated his desire to testify in a narrative fashion. Defense counsel was under the impression defendant would "comment on the state of the evidence . . . presented throughout the trial and effectively ways in which the People have failed to meet their burden of proof." At the in camera hearing, defendant insisted he would only testify on matters about which he had personal knowledge but was often evasive when questioned about what specific subjects he would broach. Eventually, through extensive dialogue with the court and defense counsel, it became clear defendant's objective was not to relate his account of the events underlying the charged crimes. (See *Rock v. Arkansas* (1987) 483 U.S. 44, 52 ["Even more fundamental to a personal defense than the right of self-representation . . . is an accused's right to present his own version of events in his own words."].) Instead, he would have addressed DNA testing and courtroom proceedings, which the court unequivocally stated would be prohibited. (See Evid. Code, §§ 350 ["No evidence is admissible except relevant evidence."], 702, subd. (a) ["[T]he testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter."].) In open court, defendant was given comprehensive admonitions and warnings about testifying in a narrative fashion (see *People v. Guzman* (1988) 45 Cal.3d 915, 941–942, overruled in part on another ground by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; *People v. Gadson* (1993) 19 Cal.App.4th 1700, 1708–1709) and—over his objections— the prosecutor's motions precluding him from testifying about DNA testing, discovery, and the credibility of other witnesses were granted. Based on the foregoing, one may reasonably infer defendant's testimony would have been so limited as to contribute little, if anything, to his defense. In addition, when defendant moved to reopen the case, he again wanted to testify in a narrative fashion but made no offer of proof as to the content

*Johnson* (2012) 53 Cal.4th 519, 525–528 [California courts have discretion to deny self-representation to defendants competent to stand trial but not competent to represent themselves].) Before the ruling could become final, defendant withdrew his request.

of his testimony. (*People v. Ng* (2022) 13 Cal.5th 448, 556.) "As such, [he] cannot establish the significance of [his] testimony." (*Ibid.*)

In view of the overall circumstances, we conclude the trial court's denial of defendant's motion to reopen the case did not constitute an abuse of discretion.

## III. The purported error was harmless beyond a reasonable doubt.

Even assuming, arguendo, the trial court should have reopened the case and permitted defendant to testify, reversal is unwarranted "if the error in not permitting [defendant] to testify was harmless beyond a reasonable doubt." (*People v. Johnson* (1998) 62 Cal.App.4th 608, 636 (*Johnson*), citing *Chapman v. California* (1967) 386 U.S. 18; see *People v. Flood* (1998) 18 Cal.4th 470, 494 [" 'To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' "].)

There is no dispute the evidence of defendant's guilt with respect to counts 2 through 4 and 6 through 9—including the numerous witnesses, surveillance footage of the underlying incidents, and/or the defendant's possession of incriminating items—was "overwhelming." (*Johnson*, *supra*, 62 Cal.App.4th at p. 636.) On the other hand, defendant claims "[t]he trial court's erroneous denial of [his] right to testify prejudiced him with respect to his conviction for first degree murder in Count 1." We disagree. Although defendant asserts "he might have testified that he was not involved in the killing and that at some point after that tragic incident he stumbled upon the knife and decided to keep it" or "he was involved in the killing but that [J.S.] was the aggressor and that he acted in self-defense or in the heat of passion,"[6] the evidence of his guilt was overwhelming. The totality of the surveillance footage captured on October 3, 2021, established: (1) defendant followed J.S. into a self-serve car wash stall, which served as

---

[6] We point out defendant—at the December 19, 2023 in camera hearing—ultimately professed he did not intend to testify about events surrounding J.S.'s murder on October 3, 2021.

the latter's "[m]akeshift home"; and (2) about a minute later, defendant fled the stall while J.S. exited with a single but fatal neck wound, an injury the forensic pathologist at trial agreed was "consistent with being inflicted by a knife blade." (See *People v. Haskett* (1982) 30 Cal.3d 841, 850 [obtaining knife "in advance of the killing[]" "constituted evidence of planning activity"]; *People v. Morris* (1959) 174 Cal.App.2d 193, 197 [inference of a preconceived plan to kill "deducible 'from a consideration of the type of weapon employed and the manner of its use; the nature of the wounds suffered by the deceased; the fact that the attack was unprovoked and that the deceased was unarmed at the time of the assault . . . and [the defendant]'s immediate flight thereafter from the scene"].) At the time the police searched the stall, they found miscellaneous objects that were "neatly placed there rather than thrown or [otherwise] involved in a scuffle." The condition of the crime scene—coupled with the absence of defensive wounds on J.S.'s body—signified the manner of killing was "coolly and steadily carried out" (*People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102) and not "a rash explosion of violence which might be committed on a victim who was advancing upon or provoking the defendant" (*ibid.*). (See *People v. Morris*, *supra*, at p. 197 [the defendant " 'did not slash wildly or without aim' "].) Four days after the murder, when defendant was arrested for carrying a concealed dirk or dagger (count 2) and brandishing a knife (count 3), among other things, "a red-and-black Milwaukee knife, approximately ten inches in length[, and] its sheath" was found on his person. A knife bearing a similar description was observed in defendant's vicinity on June 30, 2021, when officers were dispatched to L.C.'s residence in response to a report defendant was "pulling a knife out on [her] and [her] family." Finally, DNA testing of the knife and sheath linked defendant to J.S.'s murder. (See *Johnson*, *supra*, at p. 636 [strong DNA evidence connecting the defendant to the charged crimes].) Therefore, we conclude any error in denying the motion to reopen and precluding defendant from testifying was harmless beyond a reasonable doubt.

**IV.** **The abstract of judgment on defendant's determinate sentence must be corrected to reflect the sentence pronounced by the trial court.**

An abstract of judgment is "a contemporaneous, statutorily sanctioned, officially prepared clerical record of the conviction and sentence." (*People v. Delgado* (2008) 43 Cal.4th 1059, 1070, italics omitted.) "Under [section 1213], 'the certified abstract of the judgment constitutes the commitment. [Citations.] It is thus the order sending the defendant to prison and "the process and authority for carrying the judgment and sentence into effect." [Citations.]' [Citation.]" (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) However, "[a]n abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize." (*Ibid.*) "When an abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, [an appellate] court has the inherent power to correct such clerical error on appeal, whether on [its] own motion or upon application of the parties." (*People v. Jones*, *supra*, 54 Cal.4th at p. 89.)

Here, the "**FELONY ABSTRACT OF JUDGMENT—DETERMINATE**" filed February 23, 2024, contains several discrepancies. Whereas the trial court orally pronounced a consecutive three-year sentence on count 6, the abstract identifies a concurrent three-year sentence on that count. Under item 8 of the abstract, the "TOTAL TIME" for counts 2 and 6 through 9 is calculated as seven years instead of six years.[7] Finally, the abstract makes no mention of the concurrent 180 days on count 3 and a concurrent 180 days on count 4. These errors should be corrected.

_____

[7] The trial court pronounced "a total fixed term of 25 years to life, *plus seven years*" (italics added), but the "plus seven years" included the one year for the deadly weapon use enhancement on count 1. This enhancement is already reflected in the abstract of judgment for defendant's indeterminate sentence.

## DISPOSITION

The February 23, 2024 "**FELONY ABSTRACT OF JUDGMENT—DETERMINATE**" shall be amended to reflect a consecutive three-year sentence on count 6, a concurrent 180 days on count 3, a concurrent 180 days on count 4, and a "TOTAL TIME" of six years. The trial court is directed to prepare a corrected abstract of judgment and transmit copies thereof to the appropriate authorities. In all other respects, the judgment is affirmed.

DETJEN, Acting P. J.

WE CONCUR:

FRANSON, J.

PEÑA, J.

33.